**STATE of Alaska, Appellant,**

v.

**Jane DOE, Appellee.**

**No. 5716.**

Court of Appeals of Alaska.

July 16, 1982.

Richard Svobodny, Asst. Dist. Atty., Patrick J. Gullufsen, Dist. Atty., and Wilson L. Condon, Atty. Gen., Juneau, for appellant.

Paul Grant, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Juneau, for appellee.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Jane Doe [1] was indicted on several charges that involved sexual misconduct with her children.[2] As the result of a nego-

---

1. We have used fictitious names for the defendant and her family in this opinion. We feel this is necessary to protect the privacy of the children involved in this case.

2. She was originally indicted on three counts: 1) sexual assault in the first degree, AS 11.41.-410(a)(4); 2) lewd and lascivious acts committed toward a child, former AS 11.15.134(a);

tiated agreement she pled guilty to a charge of lewd and lascivious acts committed towards a child.[3] Imposition of her sentence was suspended for four years pursuant to a number of conditions.[4] The State of Alaska brought this sentence appeal. We conclude that the trial judge erred in not imposing a period of incarceration.[5]

██ The charge for which Jane Doe was sentenced arose against a background of a long history of sexual abuse of her children by her second husband, John Doe. It is necessary for us to discuss this background of sexual abuse in order for us to explain our reasons for disapproving the sentence that was imposed.

In 1964, Jane Doe married and had two children. Alice was born in December of 1964, and Bob was born one year later. Following a divorce in 1970, Jane Doe married her present husband, John Doe, in 1974. Prior to their marriage, Jane and John had a child, Charles, in 1971. In 1977, Alice and Bob were adopted by John.

Alice Doe testified that her father, John Doe, first had intercourse with her at age five.[6] She said that her father continued to have frequent intercourse with her until, at the age of fifteen, she confided in a school counselor, and ultimately criminal charges were brought against her father and mother.

Alice testified that her mother first found out that Alice was having intercourse with her father when Alice, then in the third grade, told her mother. According to Alice, she and her mother and her father had a conference about her father's sexual activities with her. Alice stated that as a result of this conference she got in a lot of trouble with her father, and her mother threatened to spank her if anything similar happened again. According to Alice, her father continued to have intercourse with her with increasing frequency as she got older, and her mother was aware of this activity. When Alice was in the sixth grade, her mother, believing that Alice might be pregnant by her father, had Alice tested for pregnancy. The test indicated that Alice was pregnant, but Alice had a miscarriage. John continued his sexual activities with Alice. Alice testified that her father had her engage in cunnilingus and feliatio. When she refused to have vaginal sex with her father, he would force her to have anal intercourse.

Bob Doe, age fourteen at the time of this case, related a similar history of sexual abuse. Starting at age seven, Bob was made to participate in oral sexual acts with his father. Bob stated that his father also had anal intercourse with him.

The pattern of sexual acts ultimately involved the entire family. During many of

---

and 3) rape, former AS 11.15.120. Count I, based on conduct occurring after January 1, 1980, is charged under the Revised Alaska Criminal Code; counts II and III are based on conduct that occurred prior to January 1, 1980, and are thus based upon the former code provisions.

3. Former AS 11.15.134(a) provided:

*Lewd or lascivious acts toward children.* (a) A person who commits a lewd or lascivious act, including an act constituting another crime, upon or with the body of a child under 16 years of age, intending to arouse, appeal to, or gratify his lust, passions, or sexual desires, or the lust, passions, or sexual desires of the child is punishable by imprisonment for not more than 10 years nor less than one year.

4. The conditions imposed were standard conditions of probation, except they limited Jane's contacts with her own children or other children under the age of eighteen, required her to

receive mental health counseling, and required her to pay the State of Alaska a reasonable amount toward the care of her children.

5. In a sentence appeal brought by the state on the ground that the sentence is too lenient, we are not authorized to increase the sentence but may express our approval or disapproval of the sentence. AS 12.55.120(b). The standard we apply on review of any sentence is whether the sentence is clearly mistaken. *State v. Lancaster*, 550 P.2d 1257, 1260· (Alaska 1976); *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

6. The trial judge found that the most accurate picture of the facts of the case was given by the children at the grand jury proceeding. We therefore have relied on the children's testimony before the grand jury in setting forth the facts.

these sexual acts, pictures were taken with an instant camera. The specific charge against Jane Doe arose out of an incident where Alice's father had Alice put on a "dildo" and Alice then had intercourse with her mother. Apparently during this incident Alice's brother Bob was present along with John. Alice also testified about one incident where she had sexual contact with her mother and about another time when her father had sexual intercourse with both her mother and her. Bob Doe testified that he had sexual relations with his mother on several occasions.[7]

The trial court found that John Doe was the primary instigator of the sexual relations involving the children and that Jane Doe was merely a follower in these activities. This finding is supported by an overwhelming amount of evidence. The evidence indicates that Jane Doe was a submissive and dependent woman who acquiesced to her husband's unconventional sexual demands and who sacrificed her children's welfare because of her own inner needs of security.[8]

It is difficult to precisely determine the extent of Jane Doe's knowledge of and participation in the family sexual activities.

However, the record does indicate that her involvement was extensive. The record supports the finding that she knew about Alice's sexual involvement from the time that Alice was in the third grade. The extensive record of sexual acts, photographs, and Jane's admitted participation demonstrate her involvement.[9]

One last issue of sexual involvement worth noting concerns some pictures of nudity and sexual play taken by Jane or her children. The fact of this picture-taking is significant because it occurred during the six months when John was away working on the North Slope. From the state's point of view, this episode casts doubt on Jane's assertion that all of the family's sexual activities occurred because of the forceful insistence of her husband. It is clear, however, that such pictures were specifically requested by John in letters and probably in phone calls. When the state asked, "How could he have had such control over you?" Jane replied, "I don't know—because he's my husband, he called, we talked on the phone, he had the letters and he had the money." Thus, Jane contended that John continued to exercise control over her even

---

7. The incidents with Bob Doe, which were the basis for counts I and III of the indictment, were ultimately dismissed as part of the plea agreement. The record also reflects that John Doe also had Bob and Charles have intercourse with their sister.

8. This conclusion is based on an extensive array of expert testimony. In a psychiatric evaluation which was part of the information provided to the trial judge with the presentence report, Dr. David Coons stated that,

Mrs. Doe is a quite inadequate feeling woman.... My impression of Mrs. Doe is that she was very afraid of making any waves which might have left her both financially and emotionally independent. In this sense, she has many features of a battered wife (emotionally, if not physically). Because of this, she appears to have gone out of her way to have rationalized what she did know about the sexual relationships in the family and to just overlook as much as possible. Even now, she has extreme difficulty believing or admitting the extent of the problem or the gravity of it. She tries to explain that she did not want her children to grow up with the rigid repressive background that she did, that her children did not really tell her what was

happening, etc. On the other hand, she did feel guilty about what knowledge she did have about it, knew that the family relationship was in many ways pathological. However, the underlying theme appears to be that she simply felt very helpless and powerless. I suspect that, at least at times, she would have done just about anything her husband asked her to do (she denies that she would do "anything"). It is my impression that Mrs. Doe did, in a very ineffective way, try to curtail them.

A family physician wrote of Jane Doe:

I think that her greatest weakness was putting the preservation of her security through her marriage to her husband above the physical and emotional welfare of the children. It is a sad commentary but I believe she chose to trade her children's welfare off in exchange for her own security of staying with a husband who was abusing them. It is true that she participated in this but I think more as a follower than a leader or initiator.

9. Although she admitted some knowledge and involvement, Jane minimized the extent of both her knowledge and participation.

at long distance. She insisted, however, that the family did not engage in the "sex act" when John was absent.

In imposing a suspended imposition of sentence, the trial court noted that Jane Doe had committed a serious offense. However, the court emphasized a number of factors that were strongly in her favor. Mrs. Doe had no prior criminal record. The court found that her husband was the person primarily responsible for the sexual acts with the children and found Mrs. Doe acted under strong provocation. He found that there was little chance of Mrs. Doe ever again committing similar acts and therefore concluded that she did not present a danger to the public. The trial court also concluded that a sentence of imprisonment was not necessary to express community condemnation of the offender and reaffirm societal norms.[10] However, in considering reaffirmation of societal norms he expressed "some trepidation that I might not be properly weighing that factor...." In carefully weighing this factor, the trial court found that imprisonment of Mrs. Doe would not further her children's best interests. The court emphasized that community condemnation of the offender and the reaffirmation of societal norms could be adequately expressed by an appropriate sentence for the dominant offender, John Doe. He also emphasized that Mrs. Doe would encounter community condemnation throughout her life from people who were aware of her offense.

We agree that it was appropriate for the trial court to consider the welfare of Mrs. Doe's children in considering whether to impose a jail sentence. The concern of the trial court was amplified in the psychiatric report from Dr. David Coons:

> The primary risk in a family incest case is that the intervention can become more destructive to everyone, including the children, than the disease. Unless there is no other alternative, total disruption of the family is generally the worst possible result. The goal is usually to preserve either the whole of the family or the largest fragment of the family possible. That is why I would again emphasize that the children must be actively included at some point in the evaluation of this case and Mrs. Doe's case. If possible, the disposition in those cases should at least to some extent reflect an overall plan for the best of all parties concerned. This is a family case and not an individual case from the 'mental health' point of view.

These concerns frequently do present difficult problems for a sentencing judge and are worthy of serious consideration. However, the record shows that in this case none of the children were living with Mrs. Doe; at the time of her sentencing they were in various state placements outside the home. A condition of Mrs. Doe's probation was that she was to have no contact with her children without the permission of the children's counselor. It does not appear that consideration of the children's welfare would prevent the imposition of a jail sentence in this case.[11]

---

10. *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

11. It is difficult to predict the future status of Jane Doe's relationship with her children. The trial judge heard testimony from the children without their mother present. Alice said she did not want to have any contact with her mother until her feelings about her mother changed; she did not know when that change would occur. Bob told the judge he did not want to have any visits from his mother. Charles was seeing his mother occasionally at the time of sentencing and wished to be reunited with her.

A psychologist, Dr. Lynn Ravsten, who performed a psychological evaluation of Jane Doe at the request of Jane Doe and her attorney, testified that it would be traumatic for the children if Mrs. Doe received a substantial jail sentence. Dr. Ravsten's reasons for this statement are not explained, but it appears that this conclusion is based upon the assumption that Mrs. Doe was in the process of reuniting with her children. We believe that it is proper for the trial judge to give weight to mental health goals which affect the children. However, even assuming that the trial court concluded that it was wise to reunite Jane Doe with her children and that the trial court placed substantial weight on Dr. Ravsten's statement, a jail sentence that would have been less than substantial does not seem to have been precluded.

We agree with the trial court that there are many factors which substantially mitigate Jane Doe's offense. However, as the trial court recognized, this is a most serious offense. The offense is particularly aggravated because of the great number of episodes of sexual abuse that occurred over a long period of time. We believe that it was necessary for the court to impose a term of imprisonment in order to express community condemnation of those who sexually abuse children.

We DISAPPROVE of the sentence imposed as being too lenient.[12]

BRYNER, Chief Judge, dissenting.

I cannot agree with the court's conclusion that Judge Stewart was clearly mistaken because he failed to require Jane Doe to serve additional[1] time in jail as a condition of her suspended imposition of sentence. Having independently reviewed the entirety of the sentencing record, I cannot say that Judge Stewart was clearly mistaken in concluding that a jail sentence was not appropriate for Mrs. Doe.

Judge Stewart held extensive evidentiary hearings regarding the events that provided the basis of Mrs. Doe's conviction, the circumstances of her marriage to John Doe, her psychological status and social background, and the difficulties that she experienced in dealing with her situation and accepting responsibility for her conduct. Much evidence was also adduced with respect to the background of Mrs. Doe's three children, their situation at the time of sentencing, their future needs, and the potential for their gradual reintegration into a healthy, parent-child relationship with their mother.

The picture of Mrs. Doe that emerges from the record is one of a woman whose own insecurity and lack of self-esteem led to an unhealthy and almost total dependence upon her husband. Her marital relationship led Mrs. Doe into a blind willingness to ignore, to rationalize and, in a very limited number of instances, to abet actively her husband's aberrant and pathological sexual relationship with the children. Mrs. Doe herself was at most a reluctant participant, never engaging in sexual conduct with her children for her personal gratification, but only in response to her husband's desires; she was a woman torn between accommodating her husband's demands and protecting the interests of her children. She opted for her husband, who was obviously the dominant force in her life. However, she never completely failed to appreciate her duty towards her children; over the years preceding her arrest, Mrs. Doe made several ineffectual efforts to obtain assistance for her children and her husband.

John Doe, Jane Doe's husband, was unequivocally the principal instigator and participant in the protracted series of sexual activities among the family members. Mr. Doe was an unusually persuasive man, one who was attuned to the emotional and psychological weaknesses of his wife and who controlled and exploited those weaknesses in order to further his abuse of the children.

In this sense Jane Doe was the subject of her husband's abuse in much the same way as were her children. While there can be no question that Mrs. Doe was legally responsible for her acts of criminal misconduct, the record, as I read it, establishes that Jane Doe was driven by the need to accommodate and placate her husband and to preserve intact, at virtually any cost, the outward semblance of normality and stabili-

---

12. We specifically do not disapprove of the fact that Judge Stewart imposed a suspended imposition of sentence. However we believe that a period of imprisonment of 90 days in jail, imposed as a condition of probation, would be the minimum which could be justified by the facts in this case. Even given the highly favorable facts favoring the defendant which the trial judge found, we believe that a substantial period of imprisonment of up to three years could also be supported by this record. The range of sentences in a case such as this is particularly broad because of the many complex issues that are involved. We believe that the trial judge is much better situated than we are to resolve these issues.

1. Jane Doe was arrested upon being indicted and served a relatively short period of incarceration before being released on bail.

ty in her family's life. She believed obedience to her husband's demands to be her only means of achieving this end, and she maintained a persistent, naive faith that their situation would improve.[2]

Judge Stewart thoroughly and thoughtfully analyzed the totality of the information before him in light of the sentencing goals mandated by *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).[3] The judge specifically noted the role played by Mrs. Doe as compared to that of her husband, the progress that she had made toward rehabilitation, and especially the long-term needs of her children. Judge Stewart concluded that Mrs. Doe did not pose a further danger or threat to her children or to others in the community and that a jail sentence was unnecessary to deter similar conduct on her part. In light of the highly unusual circumstances of the offense, the judge also concluded that incarceration of Mrs. Doe would not realistically accomplish the goal of deterring other, similarly situated, potential offenders. Additionally, the judge concluded that a jail sentence was not needed to further Mrs. Doe's rehabilitation. The prosecution did not challenge these findings below, nor does it challenge them on appeal.

The sole issue raised by the state pertains to the last sentencing goal enunciated in *State v. Chaney*: whether a sentence of incarceration is necessary here for the purpose of community condemnation, or the reaffirmation of societal norms. On this score, Judge Stewart concluded that despite the seriousness of Mrs. Doe's crimes incarceration was not necessary because community condemnation could adequately and effectively be expressed in the sentencing of Mr. Doe. Furthermore, Judge Stewart took the position that the goal of community condemnation was offset in the present case by the overriding need to provide for the long-term welfare of Mrs. Doe's children. The judge had before him convincing evidence indicating that the best potential for reducing the trauma suffered by the children lay in reestablishing normal ties with their mother. The majority of the court is correct in noting that the possibility of accomplishing this goal was speculative, at best. Given the overriding importance of this goal, however, I believe that Judge Stewart properly took steps to assure that it was not unnecessarily jeopardized. Moreover, the record permits an inference that the key to Mrs. Doe's own rehabilitation— to her ability to understand fully the extent of her culpability and to accept responsibility for her conduct—lies in rebuilding a healthy parental relationship with her children.[4] In short, from my review of the record, I find it difficult to fault Judge Stewart for recognizing and emphasizing, through his sentence, the significance of attempting to restore the parent-child relationship between Mrs. Doe and her children.[5]

Moreover, I believe entirely defensible Judge Stewart's conclusion that the highly unusual aspects of Mrs. Doe's involvement in this case rendered the prospect of deterrence to other similarly situated offenders insignificant. As a practical matter, given

---

2. The record concerning the extent of willfulness on the part of Jane Doe was not uncontradicted. The prosecution presented evidence and argued that Mrs. Doe was a considerably more willing participant in her husband's ongoing abuse of the children than she purported to be. However, the sentencing judge seems to have rejected the state's interpretation of the evidence presented at sentencing. I do not believe that Judge Stewart was clearly mistaken in rejecting the state's view of the record.

3. *See also* AS 12.55.005 and 12.55.015.

4. Because Mrs. Doe's own rehabilitation was integrally related to the possibility of being reunited with her children, I believe that it was proper for the sentencing court, and well within the scope of the *Chaney* criteria, to take into consideration the fact that the best interests of the children included the restoration of a normal and healthy relationship with their mother.

5. Although at the time of sentencing Mrs. Doe's two elder children indicated their desire not to resume living with their mother, neither child precluded this possibility in the future, and both expressed the opinion that their mother should not be incarcerated for her conduct. Mrs. Doe's youngest child, who was too young to understand why he had been separated from his mother, desired to be returned to her custody. All three children indicated dissatisfaction with their custodial placement by the state.

the psychological realities of her situation, Mrs. Doe failed to perceive that she had any choice in the nature and extent of her involvement with her husband's crimes. I find it difficult to believe that other persons similarly situated would in fact be influenced or deterred by Mrs. Doe's incarceration.

If, indeed, the acts committed by Mrs. Doe were so serious as to require incarceration for the sole purpose of expressing community condemnation, then it seems paradoxical that a ninety-day period of incarceration would suffice to satisfy this goal. Both the state and the majority seem to acknowledge that a lengthy sentence of imprisonment was not mandated for Mrs. Doe under the unusual facts of this case. Yet it seems to me that a short jail sentence would only tend to create the appearance that Mrs. Doe's offense was insignificant. Thus, I think that a relatively short sentence in this case would impede the goal of community condemnation, rather than promoting it.

Imposing a sentence in a case as sensitive, unusual and controversial as the present case poses a formidable task for a trial judge. I am highly disinclined to express disapproval under such circumstances based on a hindsight evaluation of an equivocal record. It seems to me that, by suspending the imposition of Mrs. Doe's sentence and imposing strict and appropriate conditions of probation for an extended period of time, Judge Stewart appropriately carried out his duty to impose a rational sentence based upon the *Chaney* goals, while still preserving, for the future, the option of assuring a substantial sentence of incarceration in the event that Mrs. Doe's performance on probation did not conform to the court's expectations.

Since I cannot conclude that Judge Stewart was clearly mistaken in the sentencing decision that he made in this case, I respectfully dissent.